**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-20895-BLOOM/Elfenbein**

ZANNEISHA MORRISON,

     Plaintiff,

v.

SYNOVUS BANK,

     Defendant.

_____/

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Defendant Synovus Bank's Motion for Summary Judgment ("Motion"), ECF No. [30]. Plaintiff Zanneisha Morrison filed a Response in Opposition ("Response"), ECF No. [35], to which Defendant filed a Reply, ECF No. [39]. The Court has carefully reviewed the Motion, the submissions in support and in opposition, the record, and is otherwise fully advised. For the reasons that follow, Defendant's Motion is granted.

## I.  BACKGROUND

Plaintiff was employed as a Retail Market Manager for Defendant until her termination on April 23, 2024. *See generally* ECF No. [1]. Based on the alleged discriminatory and retaliatory treatment and hostile work environment experienced during her employment, Plaintiff filed her Complaint asserting the following claims: Disparate Treatment under 42 U.S.C. § 1981 (Count I), Hostile Work Environment under 42 U.S.C. § 1981 (Count II), Retaliation under 42 U.S.C. § 1981 (Count III), Disparate Treatment under Title VII (Count IV), Retaliation under Title VII (Count V), Hostile Work Environment under Title VII (Count VI), Disparate Treatment under the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.10 *et seq.*, (Count VII), Retaliation under the FCRA (Count VIII), and Hostile Work Environment under the FCRA (Count IX). *Id.*

On August 1, 2025, the Court issued an order dismissing Count IV, V, and VI. ECF No. [24]. Accordingly, only Counts I, II, III, VII, VIII, and Count IX remain. Defendant now seeks summary judgment on the remaining claims, arguing that there is "no evidence in the record to support [Plaintiff's] conclusory assertions that she was treated unfairly because of her race" or that she experienced a hostile work environment, disparate treatment, or retaliatory treatment while employed by Defendant. ECF No. [30] at 3. Furthermore, even if Plaintiff was able to establish a *prima facie* case for any of her claims, Defendant maintains that Defendant "had a legitimate business reason for terminating [Plaintiff], namely, her failure to meet [Defendant's] expectations for business development." *Id*.

Plaintiff disagrees and contends that when evaluating the record "in the light most favorable to Plaintiff, substantial disputes of material fact exist[] on every claim." ECF No. [35] at 1. According to Plaintiff, she has "produced contemporaneous documents, company records, corroborating declarations, and deposition testimony that directly contradict[] [Defendant's] one-side account and create genuine disputes of material fact." *Id*. at 2.

### A. Material Facts

Based on the parties' briefings, the statements of material facts, and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted by the Court.

Defendant is a "financial services company that provides commercial banking services, retail banking services, and investment services." ECF No. [36] at ¶ 1. Plaintiff began working as a "Retail Market Manager III ("RMM") in Defendant's North Miami Beach Branch ("NMB Branch") on July 24, 2023. *Id*. at ¶¶ 3–4. In her role managing the NMB Branch, she "was accountable for the branch's success including its profitability, sales, customer service and support, and team development." *Id*. at ¶ 5. Additionally, Plaintiff was tasked with "developing and

2

maintaining a quality, diverse loan portfolio," which required Plaintiff to identify prospective clients and develop new customer relationships. *Id.* at ¶ 6.

### a. Sales Credits

Defendant incentivizes managers to bring in new, first-time customers[1] and "monitors the development of new business and new client relationships through the assignment of sales credits." *Id.* at ¶ 15. "If an existing customer opens a new or additional account, the manager or banker who first originated the customer's business with [Defendant] is the 'primary officer' and will generally receive credits for the customer's new account." *Id.* at ¶ 18. "Any new accounts opened for that customer will automatically code under the primary officer." *Id.* "The manager or banker who opens a new account for a customer will receive sales credit for that account opening, but the account will code under the primary officer." *Id.* at ¶ 19. Nonetheless, "[s]ales credits are given to the banker who opened the account at his or her branch even if the account is coded to the primary officer at a different branch." *Id.*

Before Plaintiff was hired for the RMM position, Stephanie Hackland was the RMM for the NMB Branch for five years, where she "developed business relationships with several clients who opened accounts at the NMB Branch because of Hackland's sales efforts."[2] *Id.* at ¶ 10. When

---

[1] None of Plaintiff's citations directly refutes that Defendant provides incentives to develop new customer relationships. Indeed, all the citations Plaintiff provides address only tangentially related matters, providing "literally no evidence" that refutes Defendant's assertion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).

[2] Plaintiff disputes several of Defendant's statements of material fact on the basis that "Plaintiff is without sufficient knowledge[.]" However, to properly place a material fact in dispute, Plaintiff must provide specific "evidentiary citations supporting [its] position . . . ." S.D. FLA. L.R. 56.1(b)(2). Accordingly, where Plaintiff has not properly placed such facts in dispute by providing evidentiary citations to support the dispute, those facts are deemed admitted. *Davis v. Brown*, No. 1:16-CV-00735, 2019 WL 1206431, at *4 (N.D. Ga. Mar. 14, 2019) (applying the Northern District of Georgia's substantially similar local rule and deeming facts admitted where "Plaintiff simply denied Defendant's claims of undisputed facts or stated she 'is without sufficient information to respond' to various paragraphs in Defendants' statement of material fact."). As such, to the extent Plaintiff denies additional assertions by Defendant without pointing to any relevant evidence in the record to support her position, the Court deems those statements of fact admitted.

Hackland transferred to the Las Olas Branch, certain accounts Hackland developed at the NMB Branch were transferred with her to the Las Olas Branch. *Id.* at ¶ 20. While Plaintiff questioned whether it was appropriate for Hackland to transfer her client accounts to the Las Olas Branch, Hackland explained to Plaintiff that the account transfers would not adversely impact Plaintiff because Plaintiff would never have been credited for any new accounts Hackland developed at the NMB Branch. *Id.* at ¶¶ 21, 22. Plaintiff was unsatisfied with Hackland's explanation, and two months later, Plaintiff decided to complain to her supervisor, Armando Trabanco, about a particular instance where Plaintiff believed "Hackland improperly received sales credits for opening a new account for a customer." *Id.* at ¶ 23.

The customer in question had come to the NMB Branch for assistance with fraudulent activity on one of his accounts. *Id.* at ¶ 24. Marilu Saleh, a Senior Relationship Banker at the NMB Branch, closed the account impacted by the purported fraud but Hackland was the one who eventually opened a new account for the customer. *Id.* at ¶¶ 26, 27. Consequently, the Las Olas Branch received credit for opening the new account notwithstanding that the customer had originally come into the NMB Branch to be serviced. *Id.* at ¶ 27. Plaintiff believed awarding Hackland the new customer credit was improper. *Id.* at ¶ 28. Besides this incident, Plaintiff can only think of one other instance where any sales credits were "improperly" awarded to Hackland and the Las Olas Branch instead of Plaintiff and the NMB Branch. *Id.* at ¶ 30.

### b.  Complaints Made Against Plaintiff by Her Subordinates

On December 27, 2023, Human Resources ("HR") contacted Plaintiff to inform her that they had received several complaints about Plaintiff from her staff. *Id.* at ¶ 32. The complaints stated that several members of Plaintiff's team, including Marilu Saleh, reported difficulty doing

their jobs under Plaintiff's leadership. *Id.* at ¶ 33. Plaintiff then decided to file her own complaints, claiming that her supervisor (Trabanco) had been bullying her and that Hackland had "instructed the subordinate members of the NMB Branch team to lodge HR complaints against [Plaintiff] to intimidate her." *Id.* at ¶ 34. "Other than her race, Plaintiff could think of no reason why Hackland would want to set her up to fail." *Id.* at ¶ 36. Plaintiff also believed her team submitted the complaints to "retaliate" against her for complaining about what she believed to be the improper transferring of sales credits from her branch to Hackland's. *Id.* at ¶ 35. During conversations about these employee complaints, Plaintiff raised her own complaints, which were categorized as allegations of unfair treatment in the workplace, and an investigation was initiated. *Id.* at ¶ 37. Once the investigation into Plaintiff's complaints began, Plaintiff drafted a Team Member Counseling Form for Saleh to address an incident that occurred on November 16, 2023, but Plaintiff never provided Saleh with the form. *Id.* at ¶ 38.

### c.   Plaintiff's Complaint to HR

On January 11, 2024, Plaintiff emailed HR "a detailed list of 'all her complaints of unfair treatment of bullying and overt discrimination she had been experiencing since starting at [the NMB Branch] on July 25, 2023.'" *Id.* at ¶ 39. The complaints included Plaintiff's concerns about transferring sales credits to Hackland, and Trabanco failing to stand up for her when a coworker sent Plaintiff "an 'aggressive' email." *Id.* at ¶¶ 40, 41. Plaintiff also complained about Trabanco denying her coverage, while previously Trabanco had secured coverage for Hackland when Hackland requested it. *Id.* at ¶¶ 42–44.

Plaintiff further complained that Hackland purportedly told one of Plaintiff's clients that Plaintiff was new and could not handle the client's banking needs. *Id.* at ¶ 45. Plaintiff also reported that one of her subordinates, Carlos Santiago, told a Black coworker that "he 'thinks all Black people are the same, dry, rude, [and] always have a down face.'" *Id.* at ¶ 46. Plaintiff believed that

Hackland directed Santiago to try and ask other team members to file HR complaints against Plaintiff so that she would be fired. *Id.* at ¶¶ 47–48.

While Defendant contends that HR's investigation into Plaintiff's complaints "resulted in no findings that Trabanco or Hackland engaged in discriminatory conduct, unfair treatment, or unethical behavior," Plaintiff disputes that a proper investigation was ever completed. *Id.* at ¶ 49; *see also* ECF No. [35] at 3.

### d. Plaintiff's Request for Coverage

On November 13, 2023, at 9:35 a.m., Plaintiff texted her supervisor, Trabanco, to ask for coverage for the day because Marilu Saleh was out sick. ECF No. [36] at ¶ 51. In that text, Plaintiff conveyed that, including herself, four members of the NMB Branch team were working, but no one knew how to open new accounts. *Id.* at ¶ 52. Trabanco did not attempt to assign the region's floater employee to the NMB Branch. *Id.* at ¶ 53. Defendant contends that Trabanco refused to make such an assignment "at the last minute" because Plaintiff, as an RMM, had undergone the relevant training to open new accounts and could call another RMM to walk her through the process if needed. *Id.* at ¶¶ 53. Plaintiff denies that Defendant's stated reason was the actual reason for Trabanco denying coverage. *Id.*

On November 10, 2023, Hackland emailed Plaintiff and Trabanco to request a floater employee for November 27, 2023. *Id.* at ¶ 54. Trabanco agreed to provide coverage. *Id.* at ¶ 55.

### e. Plaintiff's Performance

During her employment, Plaintiff "consistently failed to meet sales activities expectation for RMMs," and "[a]s a result, Plaintiff failed to generate new business for [Defendant]." *Id.* at ¶ 57.[3] "RMMs have seven goals to meet each quarter, and RMMS are required to meet at least three

---

[3] The record evidence Plaintiff relies upon to challenge Defendant's assertion about her work performance fails to create a material dispute or rebut the assertion in any meaningful way. Below is the entirety of the

of the seven goals." *Id.* ¶ 58.. While Plaintiff met three goals in her first quarter, she only met "two of the seven goals during her second and third quarters." *Id.* Moreover, Plaintiff "never originated a significant client relationship for [Defendant]." *Id.* at ¶ 59.

During a sales production meeting on February 22, 2024, Trabanco and Cheryl Lake, the Regional Sales Performance Partner, Sr., informed Plaintiff that a review of her accounts revealed that she "had originated no new business for the NMB Branch since January 1, 2024," and that "[e]very account opened was a result of one of the banker's sales activities." *Id.* at ¶ 60. During the meeting, Plaintiff attempted to blame her lack of sales production in 2024 "on the transfer of Hackland's clients' accounts to the Las Olas Branch and the award of sales credits to Hackland for new accounts opened by Hackland's customers," *id.* at ¶ 61, notwithstanding that both transfers occurred in 2023, not 2024. Additionally, during the meeting, Plaintiff asked her supervisors, "am I being treated this way because I'm Black?" *Id.* at ¶ 62.

### f.   Aftermath of the Sales Production Meeting

Shortly thereafter, Sandy Knight, the Senior Director of Human Relations, scheduled a meeting with Plaintiff "to discuss HR's concerns arising out of the Sales Production Meeting." *Id.* at ¶ 63. However, fifteen minutes before the meeting was to begin, Plaintiff canceled and asked to reschedule the meeting "for more than a week later." *Id.* at ¶ 64.

---

deposition testimony Plaintiff references in an attempt to create a dispute of material fact:

> Q. Ms. Morrison, you were questioned earlier about not meeting your sales goals. Do you
>    understand – do you recall that questioning?
> A. Yes.
> Q. Why did you not meet your sales goals?

ECF No. [36-2] at 206:1-5.

No other lines from the deposition are cited, nor is any other evidence referenced.

"Per HR's instruction, Trabanco and Susan Pitts, the Chief Operating Officer of Consumer Banking, met with [Plaintiff] on March 12, 2024, to explain how sales credits are awarded and why the transfer of Hackland's accounts to the Las Olas Branch was not improper." *Id.* at ¶ 65. While Pitts was explaining the sales credit process, Plaintiff "was looking away and was not engaged." *Id.* at ¶ 66. Plaintiff claimed that her issue with sales credits was an HR issue and that she would go to HR if she need any clarification. *Id.* at ¶ 67.

Following the meeting, Plaintiff sent an email to both the Senior Director of HR and Pitts stating that "the missing sales credits from my bankers and my branch are an HR issue." *Id.* at ¶ 68. A member of the HR team scheduled a meeting for March 13, 2024, to discuss Plaintiff's HR concerns, "but [Plaintiff] ignored the meeting invitation and did not attend." *Id.* at ¶ 69. Plaintiff later wrote to the Senior Director of HR, "I'm requesting that you do not bully me into HR meetings when I haven't requested them," and that was why she declined the meeting. *Id.* at ¶ 70.

Plaintiff "continued to fail to meet performance expectations." *Id.* at ¶ 71. Plaintiff disputes that assertion, notwithstanding that she admitted during her deposition that she only ever satisfied two out of her seven goals on her quarterly reviews during the remainder of her employment. *See* ECF No. [36-2] at 79:1-21. Eventually, Defendant issued Plaintiff a final written warning.[4] Plaintiff reported to HR that she believed the warning [was] retaliatory. *Id.* at ¶ 73. The Director of Employee Relations and Performance Enablement "attempted to address [Plaintiff's] report with her, but [Plaintiff] declined to meet with [her]." *Id.* at ¶ 74.

---

[4] Plaintiff "denies" the following assertion from Defendant: "As a result [of Plaintiff's failure to meet performance expectations], she was issued a final written warning." ECF No. [36] at ¶ 72. Plaintiff appears to only dispute the reason for the warning, not that she received the warning, given that she admitted that she "reported to HR that she believed the warning was retaliatory." *Id.* at ¶ 73.

By April 23, 2024, Plaintiff "had not shown any signs of improving her performance. Specifically, she had not met the expected sales activity strategies, had not brought any significant client relationships to [the NMB Branch], and had not produced any small business loans."[5] Defendant ultimately "terminated [Plaintiff's] employment on April 23, 2024." *Id.* at ¶ 76.

Plaintiff "knew that she had not met her goals for at least two quarters at the time she received the final written warning;" however, Plaintiff still believes "Defendant terminated her because of her race [given that] . . . [Plaintiff] 'could not think of any . . . reason' other than her race for her experience during her employment or for her termination." *Id.* at ¶ 77–78.

### B.  Disputed Facts

There are several facts in dispute that merit discussion. The Court will not address the competing *inferences* that the parties draw from certain facts but will only address actual facts in dispute.[6] The materiality of these facts will be addressed in the Discussion section, *infra*. Citations to the underlying record are again omitted for brevity.

First, Plaintiff and Defendant dispute whether it was in accordance with policy that, when Hackland transferred to the Las Olas Branch, Defendant transferred several client relationships

---

[5] The evidence Plaintiff relies upon to dispute Defendant's assertion is as follows:

> A: Yes. I'm referring to the organization.
> Q: Okay. And the organization is Synovus, right?
> A.  Yes. Not in Florida and not in my branch.

ECF No. [36-2] at 155:9-11. This is irrelevant and fails to properly place Defendant's assertion in dispute.

[6] Some of the purported "material facts in dispute" that Plaintiff identifies in her opposition to summary judgment are inferences from facts where the underlying facts are actually agreed upon by the parties. *See* ECF No. [35] at 2–3. For instance, Plaintiff argues that "[r]acially charged remarks and race-coded offensive words and phrases permeated the workplace." *Id.* at 3. However, many of the specific comments that she references are undisputed by Defendant; it is only on the implications of those facts that the parties diverge. Thus, the Court does not adopt what Plaintiff identifies as facts in dispute and provides its own analysis of the disputed facts based upon Plaintiff's Response in Opposition to Defendant's Statement of Material Facts, ECF No. [36], and the parties' summary judgment briefings, ECF Nos. [30], [35], [39].

with her and coded the associated sales credits to the Las Olas Branch. *Id.* at ¶ 81. Plaintiff contends that within Defendant's company, accounts generally "belong" to the branch at which they were opened. *Id.* at ¶ 79. Transferring an account between two branches would generally occur only by one of two means: (i) at the customer's request or (ii) automatically by the system where transactional activity at a branch triggers a re-coding. *Id*. As a general matter, managers could not, without more, "take" accounts with them when they transferred branches, even if they opened the accounts in question. *Id*. Instead, the proper protocol would involve a request and approval process. *Id.* at ¶ 80. Plaintiff contends that none of these purportedly proper procedures happened. *Id.* at ¶ 82. In support of this position, Plaintiff references the Declarations of Plaintiff's former coworkers, Juan Andrade and Georgia Reid, as well as Plaintiff's own testimony. *Id.* at ¶ 79–87.

Defendant, by contrast, contends that this transfer of sales credits took place "according to [Defendant's] policy of awarding sales credits for a new account opened by an existing customer to the RMM whose sales activities first brought the customer to [Defendant] and to the manager or banker who opens the new account." ECF No. [30] at 6. In support of its position, Defendant points to the Declaration of Cheryl Lake, the Regional Sales Performance Partner, Sr., and the Declaration of Plaintiff's supervisor, Armando Trabanco, both of whom attested to this system of assigning sales credits. *Id*.

Second, Plaintiff argues that it was contrary to company policy that she was issued a written final warning without progressive discipline. ECF No. [36] at ¶ 95. Defendant does not explicitly take issue with the characterization.  The Court sets forth the relevant section of the policy:

> You need to be aware that violations of these guidelines may result in disciplinary action up to and including immediate release from employment. The Company does not believe it is possible to state exactly what disciplinary action may result from any particular conduct that violates these or any other guidelines. The Company believes in progressive discipline. If corrective action is necessary, the steps are typically verbal warning, written warning, and release from employment. Another

> step may be suspension without pay. Ultimately, the kind of disciplinary action that can result from any particular conduct, behavior, or performance issue will depend on many factors. For example, the nature and severity of the conduct, the team member's past work record, behavior, job performance, and whether circumstances suggest that the team member is likely to make a meaningful contribution to the Company.

ECF No. [36-12] at 2–3.

Third, Plaintiff contends that similarly situated non-Black managers were treated more favorably than she was. ECF No. [35] at 2. Specifically, when complaints were lodged against Plaintiff, she was given a final warning and terminated. ECF No. [36] at ¶¶ 71–78, 88. By contrast, Plaintiff alleges that while there were also issues with the management style of Darlene Filosa (a White, Hispanic female), to Plaintiff's knowledge, Filosa was not disciplined. *Id.* at ¶¶ 88, 89. In support of this assertion, Plaintiff points to her own Declaration, her HR complaints, and the Declaration of Kay Bernard, one of Filosa's subordinates. *Id.*

Defendant, by contrast, contends that Plaintiff provides only "self-serving hearsay that subordinates of Darlene Filosa . . . lodged HR complaints against her, and that [Defendant] never disciplined or terminated Filosa." ECF No. [30] at 12. Defendant further contends that Plaintiff provides no evidence that her performance and Filosa's performance were similar. *Id.* at 12–13.

Fourth, Plaintiff argues that the HR response to her written complaints "depart[ed] from ordinary investigatory practice." *Id.* at ¶ 90. Plaintiff specifically points to the fact that HR did not interview "Tanice,"[7] replaced the Black investigator with a White investigator, and did not provide Plaintiff with "complete fact-gathering." *Id.* at ¶¶ 90, 91. In support of this position, Plaintiff largely cites to her own deposition. *Id.*

---

[7] "Tanice" presumably refers to Tanice Leslie, identified in Plaintiff's Rule 26(a)(1) Initial Disclosures. ECF No. [39-1] at 3.

Defendant contends that the purported "replacement" of Jaquita Tucker, the Black investigator, with Christie Kelly, the White investigator, is of no consequence, since "Tucker completed the investigation, and Kelly communicated Tucker's findings to [Plaintiff] because Tucker was on leave for health reasons." ECF No. 39 at [10]. Moreover, Defendant contends that HR did take Plaintiff's allegations seriously, insofar as they held meetings with Plaintiff during which they attempted to explain Defendant's policy for awarding sales credits. ECF No. [30] at 7.

Finally, Plaintiff argues that "[c]orroborating witnesses confirm a broader pattern of disparate treatment and shallow HR inquiries." ECF No. [35] at 3. Specifically, she points to the Declarations of Georgia Reid and Kay Bernard, former coworkers of Plaintiff. ECF No. [36] at ¶¶ 102–109. Reid reported that while she was terminated for failing to meet performance metrics, she was aware of non-Black managers who also failed to meet similar metrics but were not terminated. *Id.* at ¶ 104. She further reported that White and Hispanic managers were treated more favorably than Black managers. *Id.* at ¶ 105. Kay Bernard reported that she observed and experienced differential treatment by management between Black and non-Black employees. *Id.* at ¶ 107. Bernard further reported that her complaints of race-based discrimination were ignored, and she ultimately resigned due to the racially discriminatory work environment and the lack of accountability for favoritism and disparate treatment. *Id.* at ¶¶ 108–09.

Defendant does not directly respond to Reid's statements on this subject. Defendant does, however, argue that nothing in Bernard's Declaration raises "specific facts that would support a conclusion that Bernard, [Plaintiff], or any other [Defendant] employee were victims of racially hostile work environment under the Eleventh Circuit's standard." ECF No. [39] at 7–8. Specifically, Defendant contends that "Bernard identifies no facts that would establish she experienced discrimination." *Id.* at 9.

## II.  LEGAL STANDARD

### A.  Rule 56(a) Summary Judgment Standard

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* FED. R. CIV. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Liberty Lobby, Inc.*, 477 U.S. at 24–48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Liberty Lobby, Inc.*, 477 U.S. at 252.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element

13

of the case for which he has the burden of proof.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

## III. DISCUSSION

Defendant argues it is entitled to summary judgment on Plaintiff's hostile work environment, disparate treatment, and retaliation claims "because there is no evidence in the record that Plaintiff suffered unlawful discrimination" during her employment. ECF No. [30] at 1. Plaintiff responds that there are material facts in dispute as to each of her claims which preclude summary judgment. ECF No. [35]. Importantly, claims under § 1981 and the FCRA are analyzed under the same framework. *Smith v. City of Fort Pierce*, 565 F. App'x 774, 776 (11th Cir. 2014) (analyzing plaintiff's Title VII, FCRA, § 1981, and § 1983 retaliation claims under the same Title VII framework).

As an initial matter, the Court declines to consider the Declaration of Juan Andrade or Kay Bernard. As Defendant correctly points out, a district court may strike Declarations from individuals who were not identified in the Plaintiff's initial disclosures. ECF No. [39] at 1–2 (citing *Faulk v. Volunteers of Am.*, 444 F. App'x 316, 317 (11th Cir. 2011). "A party who fails to comply

14

with Rule 26(a) or (e) is precluded from using the undisclosed witness 'to supply evidence on a motion . . . unless the failure was substantially justified or is harmless.'" *Id.* (citing FED. R. CIV. P. 37(c)(1)). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x. 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

While the question of whether a party's non-disclosure is substantially justified or harmless falls within the district judge's sound discretion, the Court is guided by the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.*, No. 8:06-cv-40-T-33, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009) (quoting *Two Men & a Truck Int'l Inc.*, Case No. 4:08-cv-67-WS/WCS, 2008 WL 5235115, at * 2 (N.D. Fla. Oct. 20, 2008)).

Here, Plaintiff failed to identify Juan Andrade and Kay Bernard in her initial disclosures, ECF No. [39-1], and the record does not support that she supplemented her initial disclosures in order to properly identify them. The failure to disclose these individuals and their Declarations was not harmless, nor was it substantially justified.

First, the Declarations come as a substantial surprise, insofar as Defendant "would not have known that [Plaintiff] was relying upon information from these individuals." *Faulk*, 444 F. App'x at 318. Nothing in the Complaint indicated that they would be forthcoming; indeed, the Complaint referenced Georgia Reid, Jaquita Tucker, Christie Kelly, Armando Trabanco, Stephanie Hackland, Cheryl Lake, Susan Pitts, Carlos Santiago, and Darlene Filosa but failed to reference Andrade or Bernard. Both Andrade and Bernard signed their Declarations on February 11, 2026, *see* ECF Nos.

[36-4] and [36-10], after Defendant's Motion was filed, *see* ECF No. [30] docket entry, and well after the December 23, 2025 close of discovery. *See* ECF No. [14] at 2. Juan Andrade's name was not referenced at any point during Plaintiff's deposition, and Kay Bernard was mentioned only in passing, with Plaintiff largely equivocating on the extent and basis of her knowledge. *See* ECF No. [36-2] at 83:15–84:4, 102:10–20; *Nat'l Union Fire Ins. Co. of Puttsburgh v. Tyco Integrated Security, LLC*, No. 12-cv-80371, 2015 WL 11251736, at *1 (S.D. Fla. July 29, 2015) ("The mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)(i)." (collecting cases)).

Second, Defendant is limited in its ability to cure that surprise. Discovery has closed, and a dispositive motion has been filed. To rectify the situation in which Defendant now finds itself, Defendant would be required to seek to reopen discovery at this late stage to depose either or both witnesses. That is impracticable and would unreasonably delay the case.

Third, neither deposition meaningfully moves the needle in this case. That is to say, neither is especially important. At the summary judgment stage, the Court is not entitled to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citations omitted). A single affidavit which satisfies Federal Rule of Civil Procedure 56 and is non-conclusory "may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated." *United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018). Here, the combination of Plaintiff's deposition and the Declaration of Georgia Reid speaks to the contention that the process of transferring sales credits to Hackland's branch was contrary to company policy. *See generally* ECF Nos. [36-2], [36-3]. An additional Declaration from Andrade—who fails to identify his role within the company—adds little at the summary judgment stage. As to Bernard's Declaration, the Court fails to see what it

meaningfully adds beyond that which is covered by Georgia Reid. Reid testifies to her perceived personal experience of racial discrimination and her perception of broader patterns of racial discrimination at Defendant company. *See generally* ECF No. [36-3]. Bernard's assessment to the same effect—that she similarly perceived racial discrimination at the company, ECF No. [36-10]—adds little to the Court's summary judgment analysis.

Finally, Plaintiff has not sought leave to file a sur-reply to explain why disclosure of these witnesses was not made. Indeed, Plaintiff made no effort at all to explain why she did not disclose these witnesses earlier. As such, in the interest of fairness, the Court is constrained to strike these Declarations.

### A.  Hostile Work Environment

"To succeed on a racially hostile work environment claim under Title VII[,]  § 1981, [or the FCRA, Plaintiff] must prove: (1) she belongs to a protected class, (2) she experienced unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment, and (5) employer responsibility under a theory of vicarious or direct liability." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1334 (11th Cir. 2023) (citing *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1283 n.3, 1284 (11th Cir. 2018)). The workplace environment must be both 'objectively' and 'subjectively' hostile," and the abusive conduct must be based on the employee's race. *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 917 (11th Cir. 2026). To be considered hostile, the harassment must be so severe or pervasive as to "alter the conditions of h[er] employment." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014). It is enough to show either severe or pervasive conduct; a plaintiff need not establish both. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (*en banc*).

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift*, 510 U.S. 17, 21–22 (1993)). The factors to consider when determining whether conduct meets the minimum level of severity or pervasiveness include "(1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than 'mere offensive utterance[s],' and (4) whether it unreasonably interfered with the employee's job performance." *Yelling*, 82 F.4th at 1334 (citations omitted); *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009) (noting that determining whether conduct is objectively severe or pervasive is "not subject to mathematical precision" and requires consideration of all "the circumstantial facts.").

Defendant argues that Plaintiff cannot establish her claims because she is unable to prove that any mistreatment she experienced was because of her race or that the mistreatment was so severe or pervasive that it altered the terms of her employment. ECF No. [30] at 4. Defendant contends the only instances of mistreatment Plaintiff has identified are:

(1) Trabanco's denial of coverage for the NMB Branch;

(2) The award of sales credit to the Las Olas Branch instead of the NMB Branch;

(3) Trabanco and HR's failure to properly investigate Plaintiff's complaint about sales credits being awarded to the Las Olas Branch;

(4)  Plaintiff's subordinates filing HR Complaints against her;

(5) Trabanco's failure to protect Plaintiff from workplace disagreement with coworkers;

(6) Hackland directing customers to bank at the Las Olas Branch instead of the NMB Branch; and

18

(7) Santiago's comment to another employee that "Black people are just unhappy."

*Id*.

According to Defendant, other than Santiago's comment, there is no evidence in the record to suggest that any of the conduct outlined above was based on Plaintiff's race. *Id.* at 5. To prove conduct was because of the Plaintiff's race, Defendant contends that Plaintiff must point to evidence where similarly situated non-Black employees were treated more favorably. *Id.* (citing *Harris v. Public Trust of Miami-Dade Cnty.*, 82 F.4th 1296, 1302 (11th Cir. 2023)). Here, however, Plaintiff fails to point to a similarly situated comparator who (i) was better protected from workplace disagreements, (ii) was better protected from HR complaints from co-workers, or (iii) did not experience other branch managers attempting to solicit customers to bank at their branch instead—that is, instances (4), (5), and (6) described above. *Id*. As such, Defendant insists that the Court should only consider Trabanco's denial of coverage, the awarding of sales credits to the Las Olas Branch instead of the NMB Branch, the failure to investigate the allegedly improper transferring of sales credits, and Santiago's comments. *Id*.

Although Defendant admits that the first three incidents may be considered as part of Plaintiff's hostile work environment claims, it argues none of those three claims can reasonably be considered harassment, let alone harassment based on Plaintiff's race. *Id*. Turning first to the denial of employee coverage, Defendant argues that the record reflects that Trabanco denied coverage for several non-discriminatory reasons. *Id*. Not only had Plaintiff already "undergone Account Origination training" and therefore could open new accounts herself, but the record also reflects that Plaintiff made her request for coverage at 9:35 a.m. on the day she purportedly needed coverage, while Hackland made her request "17 days in advance." *Id.* at 5–6 (citations omitted).

Accordingly, Defendant maintains that no reasonable jury could find that the denial of coverage was based on race. *Id.* at 6.

As for awarding the Las Olas Branch the sales credits for new accounts Hackland opened, Defendant maintains there is no reasonable basis to conclude that the conduct was racially motivated, as it was in accordance with company policy. *Id.* According to Defendant, its policy had always been to award "sales credits for a new account opened by an existing customer to the RMM whose sales activities first brought the customer to [the company] and to the manager or banker who open[ed] the new account." *Id.* (citing ECF No. [29-1] at ¶ 24–25; ECF No. [29-3] at ¶¶ 30–33). Therefore, because Plaintiff offers no evidence that Defendant ever awarded sales credits to a non-Black RMM who opened a new account for an existing customer instead of the RMM who first brought the customer to the bank, there is no evidence that Defendant violated its own policies, let alone that any violation was racially motivated. *Id.*

Defendant argues the third incident—the alleged failure to investigate Plaintiff's complaint about the sales credit—cannot be reasonably considered racially motivated because the record shows that Defendant attempted to address her complaint, but Defendant's response to the complaint was simply not what Plaintiff wanted to hear. *Id.* at 6–7. Accordingly, Defendant maintains the only race-based instance of harassment the Court must consider is Santiago's comment, which is not enough to establish a workplace harassment claim based on race. *Id.* at 7, 9.

Defendant insists that Plaintiff also is unable create a genuine dispute of material fact as to whether the asserted racial harassment was so severe or pervasive that it altered the conditions of her employment. *Id.* at 7. Defendant contends that the harassment was not frequent given that Plaintiff "heard one offensive racist comment during her entire employment"—the one Santiago,

her subordinate, made. *Id.* at 8. Moreover, Defendant argues the racial comment was not severe, nor was it physically threatening or humiliating when compared to cases where the Eleventh Circuit found the evidence sufficient to survive summary judgment. *Id*. (citing *Harris*, 82 F.4th at 1305). Even if the Court were to consider all the incidents Plaintiff identified, Defendant maintains it would still not be enough to establish that the purported harassment was so severe and pervasive as to constitute a hostile work environment. *Id.* at 9–10.

Plaintiff responds that the record "contains multiple independent categories of proof which, taken together, establish triable issues on the elements of a racially hostile workplace." ECF No. [35] at 12. Plaintiff points out that when she made complaints about her workplace to HR, Defendant not only failed to complete the fact-finding portion of the investigation by not interviewing a Black woman by the name of Tanice, but Defendant also replaced the initial Black investigator with a White investigator. *Id*. Plaintiff contends that the deficiencies in the investigation "combined with rapid escalation to a final written warning and termination without prior meaningful progressive counseling, could reasonably lead a jury to infer that [Defendant] tolerated, condoned, or at least turned a blind eye to race-based mistreatment." *Id.* at 12–13.

Plaintiff further points to multiple purported instances in which she was "systematically deprived" of the resources necessary to do her job. *Id.* at 13. Plaintiff argues that the improper transfer of sales credits from her branch to the Las Olas Branch (where Hackland worked) depressed the NMB Branch's production and "materially undermin[ed]" Plaintiff's ability to meet her sales metrics and earn compensation. *Id*. Plaintiff also claims that she was purposely deprived of appropriate resources as evidenced by the fact that her request for coverage was denied by her supervisor while Hackland (a White female) was able to get her request for coverage approved. *Id*. According to Plaintiff, the record contains more than just these isolated instances. *Id*.

Plaintiff contends the record reflects that she "was repeated labeled 'aggressive,' told to 'watch your tone,' and addressed as 'young lady' after raising discrimination concerns[.]" *Id.* at 14 (citing ECF No. [36] at ¶¶ 46, 92–94). Plaintiff's subordinates were also directed to file HR complaints against her. *Id.* (citing same at ¶¶ 32–34). Plaintiff insists that her experience was not unique, as evidenced by the disparate treatment experienced by other Black managers, employees, and customers. *Id.* (citations omitted). Given this combination of evidence, Plaintiff maintains that she has provided a "convincing mosaic" of sufficiently severe and pervasive race-based hostility necessary for a hostile work environment claim to survive summary judgment. *Id.* (citing ECF No. [36] at ¶¶ at 79–109; ECF No. [36-3]; ECF No. [36-10]).

Defendant replies that there is no evidence in the record to support that Plaintiff was "repeatedly labeled 'aggressive'" or told to "watch [her] tone." ECF No. [39] at 7 (citing ECF No. [35]; ECF No. [36] at ¶ 46). Indeed, Defendant points to the fact that Plaintiff testified that she was *not* told to watch her tone but was instead told she had "a tone." *Id.* (quoting ECF No. [29-4] at 123:8–19, 125:19–22). Moreover, Defendant contends that Plaintiff only identified one instance where she was told that her "tone [was] coming off very aggressive," rather than multiple instances of being called "aggressive." *Id.* (citing same at 127:17–21). Finally, Defendant insists that while it disputes whether Plaintiff was ever called "young lady," even if that was true, the term is not inherently racial and does not resemble remarks previously found to give rise to a hostile work environment. *Id.* (citations omitted). Defendant contends that the record "does not create a convincing mosaic of circumstantial evidence of discrimination." *Id.* at 9–10.

After considering all the evidence, the Court finds that Plaintiff fails as a matter of law to "paint a picture of a work environment permeated with discriminatory intimidation, ridicule, and insult" as would be necessary to sustain her hostile work environment claim. *Harris*, 510 U.S. at

21. All the evidence Plaintiff relies upon either fails to create a reasonable inference of race-based animus or falls well short of the standard necessary to constitute severe or pervasive conduct.

As an initial matter, the Court disagrees with Defendant that Plaintiff must point to a comparator in order to establish a hostile work environment claim. That is simply not how hostile work environment claims operate. *See Sisca v. City Furniture, Inc.*, No. 2:25-CV-139-KCD-DNF, 2025 WL 2806442, at *1 (M.D. Fla. Oct. 2, 2025) (finding that a plaintiff "is not required to allege . . . a comparator under" a hostile work environment claim); *Kent v. City of Birmingham*, No. 2:18-CV-00734-JHE, 2019 WL 1505413, at *3 (N.D. Ala. Apr. 5, 2019) (rejecting argument that the plaintiff "must name a similarly-situated comparator" because he was "asserting a hostile work environment claim"); *Alexander v. City of Muscle Shoals, Ala.*, 766 F.Supp.2d 1214, 1237 n. 113 (N.D. Ala. 2011) (finding that the plaintiff's evidence that she was treated disparately relative to comparators "is not relevant to Plaintiff's hostile work environment claims"); *Lee v. Brennan*, No. 1:18-CV-4971-SCJ-CCB, 2020 WL 11885522, at *8 (N.D. Ga. Jan. 8, 2020) ("To be sure, Plaintiff is not required to offer up a comparator to prove a hostile work environment claim."), *report and recommendation adopted as modified*, No. 1:18-CV-4971-SCJ, 2020 WL 11885549 (N.D. Ga. Jan. 29, 2020). Instead, hostile work environment claims merely require a showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Thus, the Court declines the invitation to discard certain allegations and will instead consider all of them.

With the basic framework and the parties' arguments established, the Court finds that many of Plaintiff's allegations simply do not fit within the hostile work environment framework. While,

for instance, a disparate treatment claim captures "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," a hostile work environment claims captures "acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal citations and quotations omitted). Indeed, all of Plaintiff's allegations except for the claims regarding racial comments made about or directed at her could be quickly disposed of on this ground, as they simply do not implicate "intimidation, ridicule, [or] insult," and a range of cases have disposed of similar claims. *Id.*; *see also Austin v. City of Montgomery*, 196 F. App'x 747, 751 (11th Cir. 2006) (holding that the plaintiff had not shown how a *de facto* demotion "constituted harassment"); *Satchel v. Sch. Bd. of Hillsborough Cnty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (noting that "many of the incidents" cited in the plaintiff's pleadings consisted of "disputes and confrontations" that did not objectively constitute harassment, such as "workplace disputes concerning" procedures, management, and compliance with policies); *Martinez-Lopez v. GFA Alabama Inc.*, 797 F. Supp. 3d 1309, 1352 (N.D. Ga. 2025) (finding that the plaintiff had not shown how changes in her expected job role "constitutes harassment"); *McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1221 (M.D. Ga. 1997) ("[i]t is not harassment for supervisors to monitor the performance of their employees"); *Castillo v. Fisher Island Club, Inc.*, No. 20-24504-CV, 2021 WL 12313357, at *2 (S.D. Fla. Sept. 29, 2021) (holding that sending plaintiff emails about Defendant company's policies did not constitute harassment). Nonetheless, the Court addresses each allegation thoroughly in the interest of completeness.

Turning first to Plaintiff's claims regarding the HR complaints filed against her, the Court begins by noting that this does not seem to be "unwelcome harassment" at all, as would be required for a hostile work environment claim. *Yelling*, 82 F.4th at 1334 (citing *Smelter*, 904 F.3d at 1283

n.3, 1284). The filing of a complaint is not "intimidation, ridicule, [or] insult." *McCann*, 526 F.3d at 1378 (internal citations and quotations omitted). But even if filing HR complaints could be considered harassment of some sort, Plaintiff offers no evidentiary basis for her conclusion that the motivation for filing the complaints was *racial* in nature. Instead, Plaintiff simply asserts that Hackland orchestrated Plaintiff's subordinates to file the complaints. ECF No. [36-2] at 42:20–44:1; 55:1–57:4. Plaintiff claims it was Tanice who suggested to her that Hackland made such a request, *id.* at 56:15., but even if that is so (and no statements coming directly from Tanice have been offered), the Court still finds itself firmly in the realm of speculation and conjecture that any *racial* motivation existed. *Shuler*, 441 F. App'x at 715 ("Speculation or conjecture cannot create a genuine issue of material fact."). Furthermore, the this claim is squarely foreclosed by Eleventh Circuit precedent. In *Harris*, the Eleventh Circuit heard evidence that the plaintiff's supervisors "solicited peers to report on her violations." 82 F.4th at 1305. Even when combined with other allegations, the Court found no hostile work environment. *Id*. Here, too, the Court finds that no reasonable juror could infer a racial motivation or find a hostile work environment based on Plaintiff's subordinates filing HR complaints.

Second, despite Plaintiff's insistence to the contrary, the record precludes a reasonable juror from inferring that the two instances where sales credits were "transferred" from Plaintiff's branch to Hackland and the Las Olas Branch amount to a hostile work environment. For one, as above, they are simply not "harassment." In *Austin v. City of Montgomery*, the Eleventh Circuit confronted a case of a *de facto* demotion—a more extreme career impact than the transfer of two sales credits—and found that the plaintiff had not shown how a *de facto* demotion "constituted harassment." 196 F. App'x at 751. Here, too, it is unclear how potentially making it more difficult for Plaintiff to hit her performance targets constitutes harassment.

Moreover, although a violation of company policy may, in some cases, serve as evidence of discrimination, *see Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 829 (11th Cir. 2019), Plaintiff is unable to point to any specific company policy that would suggest, let alone preclude, sales credits for an account opened by an existing customer from being awarded to the RMM whose sales activities first brought the customer to the company and to the manager or banker who opened the new account. ECF No. [36-2] at 39:6–40:1 (admitting Plaintiff was never provided with the sales credit allocation policy). Indeed, Plaintiff admits that if an existing customer opens a new or additional account, the "manager [] who first *originated* the customer's business with [Defendant] is the 'primary officer' and will generally receive credit for the customer's new account," and "[a]ny new accounts opened for the customer will automatically code under the primary officer." ECF No. [36] at 3 (emphasis added).

Plaintiff's supporting Declarations fail to contradict this undisputed fact. Georgia Reid's affidavit simply states that she was aware that "Plaintiff raised concerns about accounts being removed from her branch without proper authorization." ECF No. [36] at ¶ 7. While Reid asserts that transfers without proper authorization violated company protocol, Reid does not contend that she had any personal knowledge about Hackland's account transfers or whether Hackland obtained proper authorization before any accounts were transferred.[8] Therefore, Reid's assertion that an account transfer requires proper authorization offers no insight into whether Hackland's transfers violated company policy. Although Plaintiff attempts to rely on Juan Andrade's Declaration to

---

[8] Because Reid does not purport to have first-hand knowledge of the account transfers, but was only aware about Plaintiff's concerns about the transfers, *see* ECF No. [36-3] at ¶ 7, her Declaration fails to establish whether Hackland's transfers violated company policy. *See Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030–31 (M.D. Fla. 2000) (explaining that on summary judgment, courts may not consider portions of affidavits containing inadmissible evidence such as inadmissible hearsay or statements not based on personal knowledge).

support the Defendant violated its own policies to help Hackland, Plaintiff is precluded from relying on Andrade's Declaration on summary judgment, as Plaintiff failed to properly disclose Andrade in her initial Rule 26 disclosures, nor did she ever supplement her disclosures during discovery. *See Bluestarexpo, Inc. v. Enis*, No. 21-20875-CIV, 2022 WL 16835934, at *8 (S.D. Fla. Nov. 9, 2022) (finding prejudice where untimely disclosure deprived "opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question.") (internal citations and quotations omitted). Accordingly, Plaintiff's assertion that Defendant violated company policy in allowing Hackland to transfer sales credits and customer accounts from Plaintiff's branch is unsupported by the undisputed facts.

Even assuming Plaintiff could establish that Hackland received preferential treatment because of her race *and* the Court assumed that such preferential treatment could constitute harassment, there is no evidence that the transfer of sales credits from Plaintiff's branch amounted to severe or pervasive conduct that substantially altered Plaintiff's employment. Plaintiff conceded there were only two purportedly improper sales credits transfers. ECF No. [36] at ¶ 30. For one, no reasonable juror could conclude that those two sales credits, worth approximately $1,500 each, meaningfully harmed Plaintiff's ability to hit her sales credit goals when Plaintiff could not identify what her sales credit goals were. ECF No. [36-2] at 110:10–111:1. And even if those two isolated transfers impacted Plaintiff's ability to meet her required sales production, they would not have prevented Plaintiff from meeting her other job performance requirements. *See* ECF No. [29-3] at 7–11. For those reasons, any transfers of sales credits—proper or improper—did not constitute a hostile work environment.

Third, Plaintiff's purported evidence of difficulty obtaining employee coverage is equally unavailing in demonstrating a hostile work environment. Plaintiff argues that her supervisor's

decision to deny her coverage while approving coverage for Hackland represented unfair treatment. ECF No. [36] at ¶ 44. Again, denying coverage is not tantamount to harassment as it is not at all "intimidation, ridicule, [or] insult." *McCann*, 526 F.3d at 1378 (internal citations and quotations omitted); *see also Hill v. Branch Banking & Tr. Co.*, 264 F. Supp. 3d 1247, 1262 (N.D. Ala. 2017) ("Ignoring [the plaintiff's] requests for drive-through coverage did not physically threaten or humiliate [the plaintiff], nor did it unreasonably interfere with her work. Therefore, the court finds that the record does not evidence conduct sufficient enough to rise to the level of a hostile work environment.").

But even on its own terms, Plaintiff's argument fails to withstand scrutiny, as the purported circumstances are not reasonably comparable. *McCann*, 526 F.3d at 1375 (explaining that conduct used to show that employee outside of the plaintiff protective group needs to be nearly identical to the plaintiff's conduct to ensure that "courts do not second-guess employers' reasonable decisions and confus[e] apples with oranges." (quoting *Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)).

It is undisputed that Plaintiff made her request for coverage at approximately 9:35 a.m. the day coverage was needed, whereas Hackland made her request *17 days* before her branch would need supplemental coverage. ECF No. [36] at ¶¶ 51–55. No reasonable juror could conclude that those are comparable requests and thus infer that the differential treatment was motivated by Plaintiff's race. Moreover, even if a jury could reasonably infer a race-based animus, the incident occurred only once during the entirety of Plaintiff's employment and was therefore not frequent, and it was objectively not severe. Indeed, nowhere in the record does Plaintiff allege *any* "alter[ation to] the conditions of h[er] employment" stemming from this single instance of denying coverage. *Adams*, 754 F.3d at 1248–49.

28

Fourth, Plaintiff's assertion that "a supervisor openly invoked racial stereotypes about Black employees," ECF No. [35] at 13–14, cannot—based on the undisputed facts—support a finding of a hostile work environment either. Plaintiff claims that her superiors addressed her as "young lady," repeatedly labeled her "aggressive,"[9] and told to her to "watch your tone." ECF No. [36] at ¶ 46. Although those comments might have been rude, it is a "bedrock principle that not all objectionable conduct or language amounts to discrimination[.]" *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). "[O]nly conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis. Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (internal citations and quotations omitted).

Here, the statements were not violent or humiliating, nor is there any indication that the statements were related to Plaintiff's race. *See Naraine v. City of Hollywood*, No. 21-CV-60313-RAR, 2022 WL 3577069, at *10 (S.D. Fla. Aug. 19, 2022) (finding that an isolated use of the term "young lady" was not indicative of discriminatory animus and was therefore "insufficient to establish a material fact") (internal citations omitted), *aff'd*, No. 22-13171, 2023 WL 6475507 (11th Cir. Oct. 5, 2023);[10] *Alexander v. Opelika City Schs.*, 352 F. App'x 390, 393 (11th Cir. 2009) (noting the Eleventh Circuit's previous decisions that a white employee calling a black employee "girl" did not amount to severe or pervasive harassment). Accordingly, those statements, even if

---

[9] The Court notes that Plaintiff repeatedly described other employees as "aggressive" in her complaints yet only considers other individuals' use of the word discriminatory. *See e.g.*, ECF No. [29-2] at 25, 30; ECF No. [36-2] at 124:7; 151:1.

[10] The Court notes that the plaintiff in *Naraine* was also a Black woman asserting race and gender discrimination claims. *See* 2022 WL 3577069, at *1.

rude or offensive, do not support Plaintiff's hostile work environment claims because there is no evidence that the comments were racial in nature, nor was there evidence that these comments were severe or pervasive. *Alexander v. Opelika City Schs.*, 352 F. App'x 390, 392 (11th Cir. 2009) (explaining that for a hostile work environment claim "to be actionable, this behavior must result in [] an environment that a reasonable person would find hostile or abusive . . . ").

Fifth, Plaintiff's attempt to rely on Defendant's investigation of her complaints fails to alter the Court's analysis. As stated,  a failure to investigate is not "harassment." *See Harris*, 82 F.4th at 1305 (finding that even where the plaintiff's supervisors "disbelieved or ignored her complaints of race discrimination," the district court did not err in granting summary judgment on the plaintiff's hostile work environment claim). Plaintiff emphasizes that Jaquita Tucker (a Black woman), who began the investigation, was purportedly replaced by Christie Kelly (a White woman) when Tucker went on leave for medical reasons. ECF No. [25] at 3, 12; ECF No. [36-2] at 95:21–25; 96:1–25. Plaintiff, however, offers no basis to infer that the change led to a biased or unfair result or that Kelly was motivated by discriminatory intent. "Conclusory characterizations of motive or fairness do not create a genuine issue of material fact." *Decoste v. City of Boynton Beach*, No. 24-81529-CIV, 2026 WL 265266, at *10 (S.D. Fla. Jan. 29, 2026) (citing *Johnson v. Sec'y, U.S. Dep't of Veterans Affs.*, 517 F. App'x 933, 935 (11th Cir. 2013)). Indeed, Plaintiff's claim is exactly the opposite. She asserts that *neither* Tucker nor Kelly interviewed "Tanice," a Black woman who worked at the branch.[11] Accordingly, the race of the investigator is irrelevant to the Court's analysis.

---

[11] To the extent Plaintiff asserts that a failure to interview a certain witness supports her claim, the Court disagrees. Plaintiff fails to explain why interviewing Tanice was critical to the investigation or why failing to interview a witness would constitute hostile or harassing conduct. Accordingly, Plaintiff cannot create a reasonable inference that HR's failure to interview Tanice was racially motivated, nor that it constituted harassment.

Moreover, simply because Plaintiff believed she was entitled to detailed fact-finding following the investigation does not create a reasonable inference that Defendant's failure to provide such information constitutes workplace harassment. There is no material dispute that Defendant investigated Plaintiff's HR complaint and that her case was closed on February 3, 2024. *See* ECF No. [36-9] at 3. Plaintiff fails to point to a policy indicating that a fact-finding is necessary when an employee files a complaint, nor does she identify any employee who received a detailed fact-finding report after the individual filed an HR complaint. Plaintiff's mere dissatisfaction with the process or the results of the investigation of her HR complaint, without more, is not enough to establish hostile conduct.

Finally, the Court turns to comments made by Carlos Santiago, one of Plaintiff's subordinates. ECF No. [36-2] at 44:19–45:5. Santiago commented that he thought "all Black people are the same[,] dry, rude, always have a down face." ECF No. [36] at ¶ 46 (citation omitted). While undoubtedly offensive and demeaning, this statement is insufficient to establish a hostile work environment.

In *Harris*, the plaintiff's *supervisor* stated that "blacks are lazy, and don't like to work." 82 F.4th at 1301. The Eleventh Circuit found that because the comment was isolated, not directed at the plaintiff, and wasn't as severe as remarks that courts have found created hostile environments, an action for a hostile work environment could not proceed. 82 F.4th at 1305. Especially where the comments are made by a subordinate, *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 777 (11th Cir. 2024), the Court is unconvinced that a single comment of this nature rises to the level of a hostile work environment. *See, e.g., Ivey v. Crestwood Med. Ctr.*, No. 23-11936, 2024 WL 1269765, at *1 (11th Cir. Mar. 26, 2024) (finding no hostile work environment where the plaintiff "only presented a single incident of an inappropriate comment about her race"); *McCann*, 526 F.3d

31

1370 (two or three instances of racially derogatory language alone, extending over a period of two years, were too sporadic and isolated to establish hostile work environment claim), *cert. den.*, 555 U.S. 944 (2008); *Adams*, 754 F.3d at 1255 (finding no hostile work environment where the plaintiff overhead a White coworker say that "h[e] and a [n-word] got into it," say that he would "hang that [n-word], and shoot that [n-word]," and call Black people "monkeys," and heard comments from other coworkers, saw several employees wear apparel bearing the Confederate flag, and saw racist graffiti in the restroom); *Marshall v. Aryan Unlimited Staffing Sol./Fanueil Inc./MC Andrew & Forbs Holding*, No. 12-81404, 2013 WL 836990, at *2 (S.D. Fla. Mar. 6, 2013) (finding "two isolated racially-based comments made by different supervisors" to be "too episodic and isolated to establish the objective component of a hostile work environment claim"); *Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1243 (N.D. Ala. 2019) (holding that a "single incident of making allegedly approving comments about the KKK fails to create an objectively hostile work environment"); *Small v. City of Hollywood*, 661 F. Supp. 3d 1187, 1205 (S.D. Fla. 2023) (holding that a "single racially derogative remark does not rise to the level of an unlawful employment practice" (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997))).

None of the other allegations raised by Plaintiff rises to the level of a hostile work environment. And even taken together, the Court finds no hostile work environment in the constellation of allegations provided by Plaintiff. Indeed, *Harris* is highly analogous and instructive here. In *Harris*, similar to the facts here, the plaintiff's supervisors "made one highly offensive comment, micromanaged and excessively monitored her work, solicited peers to report on her violations, made her perform clerical duties, and disbelieved or ignored her complaints of race discrimination." 82 F.4th at 1305. The Court found no hostile work environment. *Id*. Guided by the Eleventh Circuit's reasoning in that case, the Court is constrained to find that Plaintiff has

32

failed to show that a reasonable juror could infer that Plaintiff experienced any severe or pervasive harassment. Plaintiff's hostile work environment claims brought under § 1981 and the FCRA must therefore be dismissed.

### B. Disparate Treatment

Where, as here, a plaintiff claims discrimination based on circumstantial evidence, the plaintiff can establish her claims by relying on either the "*McDonnell Douglas* burden shifting paradigm or through a convincing mosaic of evidence sufficient for a jury to infer discrimination." *Session v. Deloach*, No. 3:23-CV-170-TJC-PDB, 2025 WL 3763898, at *5 (M.D. Fla. Dec. 30, 2025) (citing *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025)). This is true for claims brought under § 1981 and the FCRA. *Nash v. Palm Beach Cnty. Sch. Dist.*, 469 F. App'x 712, 713 (11th Cir. 2012) ("Employment claims brought under sections 1981 and 1983 and the FCRA involve the same analysis as Title VII disparate treatment claims." (citations omitted)). Plaintiff argues that her disparate treatment claims survive summary judgment under both approaches. *See generally* ECF No. [35].

The Court begins by describing the *McDonnell Douglas* burden-shifting paradigm.

> Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case. If the plaintiff satisfies this burden, the burden of production then shifts to her employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer proffers even one such reason, the burden then shifts back to the plaintiff, who must show that the reason given by the employer was a mere pretext for discrimination.

*Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (internal citations omitted).

A plaintiff's burden to establish a *prima facie* case "is not onerous," and Plaintiff must simply establish discriminatory treatment by a preponderance of the evidence. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff does so by establishing that: (1) she is

a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job. *Howard v. Wilkie*, 421 F. Supp. 3d 1279, 1284 (N.D. Ala. 2019) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

From there, "[t]he employer's initial showing, just as the plaintiff's, is a low bar to hurdle." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). At this next step, "[t]he burden placed on the employer is only an evidentiary one: a burden of production that 'can involve no credibility assessment.'" *Id.* at 1336 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

To establish pretext—at the final step—the plaintiff "must present 'significant probative evidence[.]'" *Owens*, 52 F.4th at 1338 (quoting *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). At that stage, "the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–65 (1981)). More specifically, "[i]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). To establish pretext, a plaintiff can reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure*

34

*Comm'n,* 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

But "[s]atisfying the *McDonnell-Douglas* framework is not essential for a plaintiff to survive summary judgment," and therefore, summary judgment should not be granted simply because the plaintiff is unable to show pretext for the defendant's purportedly non-discriminatory conduct. *Gaskin v. Healthtrust Workforce Sols.*, No. 0:24-CV-60431, 2026 WL 32786, at *7 (S.D. Fla. Jan. 6, 2026) (citing *Reeves v. Columbus Consol. Gov't*, No. 23-11463, 2024 WL 33903, at *2 (11th Cir. Jan. 3, 2024)). Instead, a plaintiff may also survive summary judgment by "present[ing] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Gaskin*, 2026 WL 32786, at *7; *see also Ismael*, 161 F.4th at 761 ("Our precedent, then, makes clear that a plaintiff who cannot establish the *McDonnell Douglas prima facie* case is entitled to a full review under the convincing mosaic standard."). The convincing mosaic inquiry allows a court to look beyond the *prima facie* case where a plaintiff points to evidence of, "among other things, (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342; *see also Hillman v. Remain at Home Senior Care*, No. CV 124-096, 2026 WL 497842, at *6 (S.D. Ga. Feb. 23, 2026).

Although the convincing mosaic standard allows the Court to consider less traditional circumstantial evidence, the ultimate inquiry is the same under either the *McDonnell Douglas* or convincing mosaic framework—looking at the evidence in the light most favorable to the plaintiff, is there sufficient circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker[?]" *Hillman*, 2026 WL 497842, at *6 (citing *Ossmann v.*

*Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023); *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)).

Defendant argues that it is entitled to summary judgment on Plaintiff's disparate treatment claims because there is no evidence in the record that creates a reasonable inference of intentional discrimination. ECF No. [30] at 10. Defendant begins by acknowledging that Plaintiff may establish her disparate treatment claims through circumstantial evidence of discrimination by utilizing either the *McDonell Douglas* framework or the convincing mosaic standard. *Id.* (citations omitted).

Defendant argues that Plaintiff cannot establish a *prima facie* case of disparate treatment under the *McDonnell Douglas* framework because she has failed "to provide evidence of a comparator who is similarly situated in all material respects." *Id.* at 12. According to Defendant, the only non-Black RMM Plaintiff can point to is Darlene Filosa. However, Plaintiff's only evidence that Filosa received more favorable treatment is self-serving hearsay claiming that, despite HR complaints lodged against her, Defendant never terminated or disciplined Filosa. *Id.* Even accepting those hearsay statements as true, Defendant argues Plaintiff fails to provide any evidence that Filosa similarly performed below expectations. *Id.*

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of disparate treatment or retaliation, Defendant asserts that Plaintiff would still be unable to proceed under the *McDonell Douglas* framework because Defendant "had a legitimate, non-discriminatory reason for terminating her employment"—namely, Plaintiff's poor job performance. *Id.* at 16. Defendant points out that Plaintiff consistently failed to either meet expectations for sales activity or generate new business; this was even though the NMB Branch was a top performing branch prior to her arrival. *Id.* at 16–17 (citations omitted). Moreover, for the final two quarters, Plaintiff failed to

meet even the minimum number of performance goals required for her job. *Id.* at 16 (citations omitted). After receiving the final warning, Defendant points out that Plaintiff still failed to meet sales activity expectations. *Id.* at 17 (citations omitted). Accordingly, because Plaintiff offers no evidence of pretext beyond her own assertion of good performance—which is insufficient to establish pretext—Defendant maintains her claims fails under the *McDonnell Douglas* burden shifting analysis. *Id.* at 17–18 (citations omitted).

Defendant argues that Plaintiff cannot establish her disparate treatment claims under the convincing mosaic standard either because there is no evidence that Defendant considered Plaintiff's race when it awarded sales credits to Hackland, when it issued the final warning, or when it ultimately terminated Plaintiff. *Id.* at 18–19 (citations omitted). Additionally, Plaintiff does not point to (i) permissible evidence of non-Black employees who were not terminated notwithstanding their failure to perform or (ii) any incentive that Defendant had to treat non-Black employees more favorably. *Id.* at 19. Therefore, because Defendant contends there is no evidence that Plaintiff was discriminated against beyond her "conclusory say-so," it insists that it is entitled to summary judgment on the disparate treatment claims. *Id.* at 20.

Plaintiff responds that she has more than satisfied her "modest" burden of establishing racial discrimination. ECF No. [35] at 8. According to Plaintiff, the "record supports a reasonable inference that Plaintiff was subjected to race discrimination through both the manipulation of sales credits and the disparate enforcement of performance standards[.]" *Id*. To avoid redundancy, the Court clarifies that "manipulation of sales credits" refers to Plaintiff's claims regarding Hackland "taking" accounts to her new branch, and "disparate enforcement of performance standards" refers to Plaintiff's purported comparison to Darlene Filosa and Hackland herself. *Id.* at 8–9.

37

Turning to showing that Defendant's proffered reason for Plaintiff's termination—her deficient performance—was pretext, Plaintiff contends that she may overcome the evidence of her poor performance by providing evidence that Defendant's explanation is untrustworthy. *Id*. Plaintiff claims she has proven that Defendant's explanation is untrustworthy given that "[s]ales credits were re-coded away from Plaintiff's branch in violation of protocol; coverage was approved for Hackland but denied to Plaintiff []; HR investigations omitted key witnesses []; and Plaintiff was the only Black manager disciplined and terminated under these circumstances." *Id.* at 9–10 (citations omitted).

Overall, Plaintiff cites to four key pieces of evidence that she contends satisfy her burden. First, she points to her own contemporaneous complaints, which she contends show a "persistent pattern" of practices by Defendant that hurt her performance. *Id.* at 10 (citations omitted). Second, Plaintiff argues that she has "supplied concrete operational examples showing that" work done by NMB personnel was coded as sales credits for the Las Olas branch, thereby impacting Plaintiff's ability to meet her performance metrics. *Id.* (citations omitted). Third, Plaintiff contends the record shows direct racial animus through the comments and actions of Carlos Santiago. *Id.* at 11 (citations omitted). Finally, Plaintiff points to corroboration from other former coworkers, including Kay Bernard, which she contends gives rise to a convincing mosaic of circumstantial evidence.[12] *Id*. (citations omitted).

In its Reply, Defendant makes three arguments. First, Defendant contends that the record does not support Plaintiff's assertion that non-Black RMMs were treated more favorably than Plaintiff. ECF No. [39] at 3. Defendant addresses both Juan Andrade and Georgia Reid's Declarations, but because the Court has declined to consider Juan Andrade's Declaration, the Court

---

[12] As noted above, the Court declines to consider Kay Bernard's Declaration, as her presence as a witness was not disclosed by Plaintiff, and the failure to disclose was not harmless nor substantially justified.

will similarly not consider arguments addressing that Declaration. As to Georgia Reid, Defendant contends she was "not qualified to testify about [Defendant]'s policies for awarding sales credits or coding or transferring accounts." *Id*. Specifically, Defendant contends that Reid makes assumptions about proper account transfer procedures and "does not provide any specific facts about her experience to support her belief." *Id.* at 4. Because she "lack[s] personal knowledge of [Defendant]'s policies," her Declaration is "not competent evidence and cannot rebut the sworn statements of [Defendant]'s Regional Sales Performance Partner, Sr." *Id.* at 4–5. Furthermore, Defendant refutes Plaintiff's invocation of Filosa as a non-Black comparator, arguing that Plaintiff "provides no evidence that Filosa was not disciplined in response to Bernard's complaints," nor that her performance was as poor as Plaintiff's. *Id.* at 5.

Second, Defendant argues that there is no evidence the account and sales credit transfers to Hackland had an effect on Plaintiff's ability to meet sales expectations or to generate new client relationships. *Id*. This is because, even under Plaintiff's view, only two sales credits were improperly awarded to Hackland, and Plaintiff provides no evidence that she would have performed significantly better had she been awarded those credits. *Id.* at 6. Moreover, Plaintiff's failures went well beyond sales credits—she "consistently failed to complete the required number of financial needs analyses per month and to hold the required number of face-to-face meetings and development sales coaching meetings with her bankers per month." *Id.* (citations omitted). She similarly failed to "originate a single significant client relationship" for Defendant throughout her entire employment. *Id.* (citations omitted). Thus, Plaintiff cannot show that Defendant caused her to perform poorly. *Id*.

Finally, Defendant argues there is no convincing mosaic of circumstantial evidence. *Id.* at 9. Ignoring Defendant's arguments regarding Kay Bernard's Declaration, Defendant contends that

the record contains no evidence that Defendant considered race when it "awarded sales credits to Hackland, issued [Plaintiff] the final written warning, or terminated her," nor did Plaintiff show that "she was fired or demoted along with other Black employees for failing to perform while no [W]hite employees were fired or demoted for failing to perform, []or that [Defendant] had any incentive to treat its Black employees differently from its non-Black employees." *Id*. (citations omitted).

The Court agrees with Defendant for three reasons. First, Plaintiff fails to make her *prima facie* case for racial discrimination. Second, Defendant's nondiscriminatory explanation for Plaintiff's termination is sufficient and not adequately rebutted. Finally, Plaintiff does not present a convincing mosaic of circumstantial evidence.

As to the first point, in order to make her *prima facie* case, Plaintiff was required to show that her employer treated "similarly situated" employees outside of her protected class more favorably. *Lockheed-Martin Corp.*, 644 F.3d at 1325; *see Lewis*, 918 F.3d at 1220–1221. In an effort to make this showing, Plaintiff points primarily to Darlene Filosa, a non-Black manager. ECF Nos. [1] at ¶ 25; [36] at ¶ 88. But there are several issues with Plaintiff's appeal to Filosa. First, "Plaintiff acknowledged that she does not know whether Ms. Filosa received any corrective action other than the fact that she was not terminated." ECF No. [36] at ¶ 88. So there is simply no evidence on the record from which a reasonable juror could infer that Filosa was treated more favorably than Plaintiff. Second, and more significantly, Plaintiff has failed to establish that Filosa is a valid comparator in the first instance. When asked if she knew whether Filosa had met her performance goals, Plaintiff replied that she did not know. ECF No. [36-2] at 103:2–4. Thus, there is no evidence on the record from which a reasonable juror could infer that Filosa was "similarly situated" to Plaintiff. *See Giles v. Daytona State Coll., Inc.*, 542 F. App'x 869, 873 (11th Cir. 2013)

40

(holding that the plaintiff had failed to establish a *prima facie* case for race discrimination where the plaintiff did not "identify anyone who had similar performance issues who received another yearly contract").[13]

To the extent Plaintiff attempts to frame Stephany Hackland as a comparator, her attempts are equally unavailing. Plaintiff argues that Hackland received coverage where Plaintiff did not and took "Plaintiff's" sales credits. ECF No. [1] at 3. But again, problems abound with this purported comparator. As to the coverage issue, the undisputed facts show that the situations were not comparable, much less identical. For one, Plaintiff requested coverage at 9:35 a.m. on the *same day* she needed coverage, whereas Hackland asked *17 days* in advance. ECF No. [36] at ¶¶ 51, 54. Moreover, Plaintiff indicated she had four team members working that day, while Hackland indicated she only had two employees working. *Id.* at ¶¶ 53, 55. Even accepting as true Plaintiff's assertion that she did not know how to open a new account, ECF No. [36-2] at 62:7–15—which itself appears unreasonable as she admits to being trained, ECF No. [29-3] at 26—the situations are simply not analogous.

As to the sales credits issue, Plaintiff has not adduced competent evidence supporting her assertion of how the sales credit allocation system worked, much less evidence to rebut the

---

[13] In certain cases, the Eleventh Circuit has indicated that, for someone to serve as a valid comparator, their conduct must be "nearly identical" to the Plaintiff's conduct. *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984). In other cases, the Eleventh Circuit indicated that a comparator is "similarly situated" if he or she was accused of "the same or similar conduct." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d 1213; *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001).

Any conflict between these standards is immaterial here, as Plaintiff fails to establish a comparator under either standard. Plaintiff's firing was purportedly the result of a combination of sales activity issues, failure to hold the required number of face-to-face meetings and development sales coaching meetings with bankers, failure to complete the required number of financial analyses per month, and failure to originate new client relationships. ECF No. [39] at 6. At the very minimum, Plaintiff admits that she failed to meet performance goals for at least two quarters at the time she received the final written warning. ECF No. [36-2] at 82:5–25. Plaintiff does not indicate whether *any* of these purported grounds—including the one to which she admits—similarly applied to Filosa, making her an unsuitable comparator.

unequivocal Declarations of Armando Trabanco and Cheryl Lake provided by Defendant. Plaintiff does not point to any actual policy. Instead, she points to her own deposition, during which she admitted that she was never provided with the sales credit allocation policy, ECF No. [36-2] at 39:6–25; 40:1, and the Declaration of Georgia Reid, which merely indicates that an approval process was needed, without any indication of whether Hackland received such approval. *See generally* ECF No. [36-3].[14] Plaintiff's attempt to rely on the Declaration of Juan Andrade to bolster her assertion is unhelpful, as the Court declines to consider his untimely and undisclosed declaration. *See supra,* Discussion, Section III. Thus, not only did Plaintiff fail to show how the sales credit allocation policy worked, but she also failed to show that even under her own understanding of it, any violation of the policy occurred.

Indeed, the undisputed facts go further. Plaintiff admitted that "[i]f an existing customer opens a new or additional account, the manager or banker who first originated the customer's business with [Defendant] is the 'primary officer' and will generally receive credit for the customer's new account.[] Any new accounts opened for that customer will automatically code under the primary officer." ECF No. [36] at ¶ 18. If that is the policy, then Hackland receiving the credits she did was not improper. As such,  no reasonable juror could conclude that Plaintiff has shown a violation of a policy in favor of Hackland.[15]

---

[14] Again, because Reid does not purport to have first-hand knowledge of the account transfers but rather was only aware about *Plaintiff's* concerns about the transfers, *see* ECF No. [36-3] at ¶ 7, her affidavit fails to establish whether Hackland's transfers, in fact, violated company policy. *See Story*, 120 F. Supp. 2d at 1030–31 (explaining that on summary judgment, courts may not consider portions of affidavits containing inadmissible evidence such as inadmissible hearsay or statements not based on personal knowledge).

[15] Moreover, if the Court were to be strict about the "similarly situated" analysis and require "nearly identical" behavior, *Nix*, 738 F.2d at 1185, the Court could require that Plaintiff point to a case a where she originated business, the client then went to open a new account at another branch, and the sales credits *were not* coded to Plaintiff and her branch. That would actually be identical behavior to Hackland's with different treatment, and Plaintiff has pointed to no instances where this was the case. But the Court need not require this level of similarity, because Plaintiff fails even under the more relaxed standard of "the same or similar conduct." *Holifield*, 115 F.3d at 1562; *Anderson*, 253 F.3d at 564.

Turning now to the next two steps of the *McDonell Douglas* framework—Defendant's proffered legitimate, nondiscriminatory explanation for Plaintiff's termination and Plaintiff's ability to show pretext—the Court finds that Defendant amply carried its burden, and Plaintiff fails to offer any meaningful rebuttal. Defendant conveyed that it fired Plaintiff for several reasons: her sales activity issues, her failure to hold the required number of face-to-face meetings and development sales coaching meetings with bankers, her failure to complete the required number of financial analyses per month, and her failure to originate new client relationships.  ECF No. [39] at 6; *see also* ECF No. [29-3] at 41–42. Defendant further states that Plaintiff "never closed a small business loan during her entire employment." ECF No. [30] at 16 (citing ECF No. [29-3] at ¶ 50). At their core, those reasons boil down to Plaintiff's "failure to meet [Defendant]'s performance expectations." ECF No. [30] at 1. In support, Defendant provides the Declaration of Armando Trabanco, Plaintiff's supervisor, the Declaration of Christie Kelly, Director of Employee Relations and Performance Enablement, and the Declaration of Cheryl Lake, Regional Sales Performance Partner, Sr. ECF Nos. [29-1], [29-2], and [29-3]. Defendant also provides supporting documentation, including Plaintiff's final written warning, ECF No. [29-3] at 32–33, and the contemporaneous explanation Defendant gave at the time of Plaintiff's termination, *id.* at 41–42.

Plaintiff attempts to rebut those allegations but fails to do so. For instance, Defendant alleged that, based on the Declaration of Plaintiff's supervisor, Armando Trabanco, Plaintiff "never originated a significant client relationship for [Defendant]." ECF No. [36] at ¶ 59 (citing ECF No. [29-3] at ¶ 49). Plaintiff's rebuttal is a mere denial, without pointing to *anything* in the record to support that denial. ECF No. [36] at ¶ 59. That is insufficient. To properly dispute a fact, Plaintiff must provide specific "evidentiary citations supporting [its] position . . . ." S.D. FLA.

L.R. 56.1(b)(2); *see also Thomas v. Dade Cnty. Pub. Tr.*, 177 F. Supp. 2d 1283, 1288 (S.D. Fla. 2001) ("[C]onclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment."). Plaintiff either admits or does not dispute that she failed to hold the required number of face-to-face meetings and sales development coaching meetings with bankers or complete the required number of financial analyses per month. ECF No. [36-2] at 111:6–112:16. As to Plaintiff's failure to close any small business loans, Plaintiff, in her denial, points to an entirely irrelevant portion of her own deposition. ECF No. [36] at ¶ 75 (citing ECF No. [36-2] at 155:9-11).[16]

Defendant has met its burden of putting forward a legitimate, nondiscriminatory explanation for its termination of Plaintiff. Plaintiff was therefore required to address this purported legitimate reason "head on and rebut it." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 838 (11th Cir. 2015) (quoting *Chapman v. AI Trans.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*)). To do so, Plaintiff ought to have "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendant]'s proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *McCann*, 526 F.3d at 1375). Instead, at best, Plaintiff failed to refute Defendant's reasons, and, at worst, Plaintiff plainly admitted that Defendant's reasons were true. Plaintiff's general insistence on her own good job performance is not enough, *Holifield*, 115 F.3d

---

[16] The portion of the record to which Plaintiff cites merely says as follows:

> A. Yes. I'm referring to the organization.
> Q. Okay. And the organization is Synovus, right?
> A. Yes. Not in Florida and not in my branch. I'm . . .

ECF No. [36-2] at 155:9-11. This has nothing to do with loans of any sort and does not call Defendant's assertion into dispute.

at 1565 ("[W]here the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence."), nor are her allegations of discriminatory intent, which constitute mere "conclusory say-so." *Flowers*, 803 F.3d at 1337. In that sense, Plaintiff has failed to carry her "ultimate burden" of establishing intentional discrimination. *Burdine*, 450 U.S. at 256.

Finally, Plaintiff has failed to provide a convincing mosaic of circumstantial evidence supporting an inference of discrimination. Plaintiff maintains that several matters make up this convincing mosaic: (1) Plaintiff's contemporaneous complaints regarding sales credit allocation patterns that were not experienced by non-Black peers; (2) examples of sales credits being coded to the Las Olas Branch despite work being performed at the NMB Branch, thereby impairing Plaintiff's ability to meet her goals; (3) racially hostile comments made by Carlos Santiago and his requests that employees submit HR requests about her, and (4) corroboration from other employees, including Kay Bernard, that Defendant engaged in patterns of racial discrimination. ECF No. [35] at 10–11. Plaintiff also cites to coverage being granted to Hackland but denied to Plaintiff, "incomplete and irregular" HR investigations into Plaintiff's complaints, direct escalation to final written warning without progressive discipline, and corroborating testimony from Georgia Reid, Kay Bernard, and Juan Andrade. *Id.* at 18–19.

Taken together, those allegations fail to paint a convincing mosaic of circumstantial evidence. As the Court explained earlier, , Plaintiff failed to create a dispute as to whether the allocation was contrary to policy; she never saw the policy before bringing her claim that the policy was violated, ECF No. [36-2] at 39:6–25; 40:1, and Georgia Reid had no independent knowledge of whether Hackland followed the approval protocol she described. *See generally* ECF No. [36-

3]. Indeed, Plaintiff admitted that the policy was for accounts to stay with whomever "originated" the client relationship. ECF No. [36] at ¶ 18. More significantly, Plaintiff failed to point to *anything* indicating that the allocation of sales credits was done considering her race. Plaintiff failed to establish a valid, similarly situated comparator of another race who took the same actions and received a different allocation of sales credits.

Moreover, the racially hostile comments by a *subordinate*, while abhorrent, do not indicate anything about how *superiors* made decisions regarding Plaintiff's termination. *See Aristyld v. City of Lauderhill*, 543 F. App'x 905, 908 (11th Cir. 2013) ("[S]tray remarks that are 'isolated and unrelated to the challenged employment decision' are insufficient in this respect." (citing *Rojas v. Florida*, 285 F.3d 1339, 1342–43 (11th Cir. 2002))). Carlos Santiago's comments would only be "probative if they illustrate the decision-maker's state of mind at the time that he made the challenged employment decision." *Id.* (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999)). There is no evidence that Santiago's racial animus translated into racial animus by Plaintiff's superiors at the time they made the decision to terminate Plaintiff. Furthermore, Plaintiff's claim that Santiago coordinated an HR complaint campaign against Plaintiff is unsupported by the record. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("[C]onclusory allegations without specific supporting facts have no probative value." (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). There is no evidence in the record that this campaign existed and no reasonable juror could infer that a racially biased campaign informed Defendant's decision to terminate Plaintiff.

The Court has previously addressed the remaining claims. The fact that Defendant denied Plaintiff coverage but gave coverage to Hackland is of no consequence, insofar as the circumstances under which they asked for coverage were markedly different. The fact that

46

Defendant's HR team did not interview Tanice or provide Plaintiff with a complete fact-finding as Plaintiff requested does not prove that the investigation was "incomplete" or "irregular;" Plaintiff does not point to a policy requiring HR to interview every witness requested or to provide a complete fact-finding. The lack of progressive discipline is not probative where Defendant's policy expressly contemplates different forms and paths of discipline depending on the particular conduct; progressive discipline was an aspiration, not a requirement. ECF No. [36-12]. And Plaintiff's attempt to rely on corroborating testimony from Juan Andrade and Kay Bernard is misplaced; those Declarations came late and with great surprise, and as such, they are not considered. Georgia Reid's Declaration, ECF No. [36-3], is largely conclusory. The Court is left with conclusory allegations of discrimination from two individuals—Plaintiff and Reid—neither of whom effectively point to valid comparators. Indeed, Reid simply states, "I was aware that other non-Black managers who also failed to meet similar metrics were not terminated," without providing names or any indication of the metrics at issue. *Id.* at 2.

Overall, whether under the *McDonnell Douglas* framework or convincing mosaic framework, the end result is the same. Plaintiff has not carried her burden of establishing a *prima facie* case, rebutted Defendant's proffered legitimate reason for her termination, or shown a convincing mosaic of circumstantial factors leading to an inference of discriminatory intent in her termination. Defendant, by contrast, has shown that there is no genuine dispute of material fact and that it is entitled to judgment in its favor as a matter of law. Thus, Plaintiff's race discrimination claims based on disparate treatment brought under § 1981 and the FCRA will be dismissed.

### C.  Retaliation

To prevail on a retaliation claim under the *McDonnell Douglas* framework, a plaintiff must present evidence that (1) she engaged in a statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was a causal connection between the two events. *See*

*Fulford v. Miami-Dade County*, 219 F. Supp. 3d 1248, 1255 (S.D. Fla. 2016); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). This is true whether the claim is brought under § 1981 or the FCRA. *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *Flores v. Devry Univ., Inc.*, 573 F. App'x 833, 835 (11th Cir. 2014). And like discrimination claims, a plaintiff's retaliation claims may survive summary judgment based on a convincing mosaic of circumstantial evidence. *See Decoste v. City of Boynton Beach*, No. 24-81529-CIV, 2026 WL 265266, at *17 (S.D. Fla. Jan. 29, 2026). Whatever form the evidence takes, "so long as [it] raises a reasonable inference" that the employer retaliated against the employee, 'summary judgment is improper.'" *Id*.

There is no genuine dispute that the type of complaints Plaintiff made to HR and her supervisors are typically considered protected activities, given that "[t]he making of informal complaints or the use of an internal grievance system is protected conduct under the opposition clause." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1144 (11th Cir. 2020); *see also Furcron*, 843 F.3d at 1311 (noting the non-discrimination "protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well"); *DeLeon v. ST Mobile Aerospace Engineering, Inc.*, 684 F. Supp. 2d 1301, 1324 (S.D. Ala. 2010) ("Statutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits.").

However, to establish protected activity under the opposition clause, a plaintiff must show that she had a good faith and objectively reasonable belief that her employer was engaged in unlawful employment practices. *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005). "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his

48

employer was engaged in unlawful employment practices, but also that his belief was *objectively reasonable* in light of the facts and record presented." *Little*, 103 F.3d at 960 (emphasis in original). This does not require that the plaintiff prove that the employment practice was unlawful, but "the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*; *see also Johnson v. Fam. Prac. & Inj. Ctr., Inc.*, 437 F. Supp. 3d 1108, 1123 (M.D. Fla. 2020) ("The plaintiff is not required to prove that the alleged discriminatory conduct was actually unlawful, as such opposed conduct need only be 'close enough' to support the objectively reasonable belief.").

Here, Defendant argues that Plaintiff's conduct did not constitute statutorily protected activity because her complaints did not contain objectively reasonable allegations of racial discrimination. ECF No. [30] at 13. According to Defendant, Plaintiff merely assumed any perceived mistreatment was due to her race, as she could think of no other reason why Hackland was awarded the sales credits, why her employees filed grievances against her, why she was denied coverage for her branch, why HR determined her complaints lacked merit, and why she received a final written warning. *Id.* at 14. Defendant insists these baseless assumptions are insufficient to establish that Plaintiff's actions were made in good faith. *Id.* (citations omitted).

Plaintiff responds and points to the multiple times that she complained to various parties as examples of statutorily protected activities. ECF No. [35] at 15–16. She contends that there existed adverse employment actions—namely, the final written warning and termination—and a causal connection based on "temporal proximity, the employer's procedural deviations, the manipulation of Plaintiff's metrics by [Defendant]'s own operational choices, and corroborative comparator evidence." *Id.* at 16–17. Plaintiff argues that the "performance" explanation for

Plaintiff's termination "collapses under the record," citing to the same examples that underpin her hostile work environment and disparate treatment claims. *Id.* at 17.

Defendant replies that even if Plaintiff could establish a *prima facie* case for discrimination, she cannot rebut Defendant's legitimate explanation for her termination by showing pretext. ECF No. [39] at 8. She does not rebut the allegations that she failed to complete the required number of financial needs analyses per month, to hold the required number of face-to-face meetings and development sales coaching meetings with her bankers per month, or to originate any significant client relationship. *Id.* (citations omitted).

The Court agrees with Defendant that Plaintiff has failed to establish a *prima facie* case for retaliation, insofar as she did not have an objectively reasonable belief that she was subject to racial discrimination. The law on objective reasonableness is clear:

> [I]t is not objectively reasonable to presume that, simply because an employee has been subjected to seemingly inexplicable negative treatment, the true reason for the treatment must be unlawful discrimination. In other words, it is not objectively reasonable to infer race or gender discrimination merely from the lack of a clear reason for an employer's mistreatment of its employee.

*Herron-Williams v. Alabama State Univ.*, 805 F. App'x 622, 632 (11th Cir. 2020). Plaintiff has stated that she "could not think of any . . . reason" other than race for her experiences while employed or her termination. ECF No. [36-2] at 54:9-25.

That is the crux of the issue here. As the Court has already explained, Plaintiff has failed to put forth any evidence that would create a reasonable inference of intentional discrimination. Instead, the record is rife with instance of Plaintiff assuming a racial motive where she could not see another reason for an action. However, those adverse actions are readily explainable by the very performance issues that Plaintiff fails to rebut, as discussed above. Fundamentally, the objective reasonableness of a belief "is measured by reference to controlling substantive law."

*Furcron v. Mail Cntrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)). But far from showing a hostile work environment or disparate treatment, Plaintiff has not shown even a "close case." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). As such, Plaintiff's beliefs about discrimination cannot be objectively reasonable. [17]

Moreover, even if Plaintiff could present a *prima facie* case, she has failed to show that Defendant's proffered reasons for her discipline and termination were pretextual. *Harris* is once again instructive here. In finding that the plaintiff had failed to show pretext, the Eleventh Circuit explained:

> [Defendant] stated its reasons—primarily tardiness, absences, and insubordination—in six disciplinary-action reports, two suspension letters, and a termination letter. Other than her own testimony, Harris offers essentially no evidence that she wasn't tardy, absent, or insubordinate. Nor does she provide any basis for concluding that the hospital's timekeeping software's records were inaccurate.

82 F.4th at 1305–06. The situation here is highly analogous. Defendant gave its reasons for Plaintiff's discipline and termination—namely, her poor performance—and in support of that proffered reason, it provided, among other things, declarations from Plaintiff's supervisor, another superior, and an HR representative, an HR complaint about Plaintiff, voluminous email records, HR reports, Plaintiff's final written warning, and Plaintiff's termination documentation. Other than her own testimony, Plaintiff offers essentially no evidence that she met performance standards or

---

[17] The single exchange cited with Carlos Santiago does not change the Court's analysis. The Eleventh Circuit has held that a coworker's single racially derogatory remark was insufficient to serve as a basis for a discrimination charge; thus, the plaintiff's complaints were not objectively reasonable, and the district court did not err in finding that the plaintiff failed to satisfy the first prong of a *prima facie* case for retaliation. *Wilson v. Farley*, 203 F. App'x. 239, 247–48 (11th Cir. 2006); *see also Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (holding that the plaintiff's belief that a white co-worker's racial epithets amounted to an unlawful employment practice by the employer was not objectively reasonable).

any basis for disbelieving the contemporaneous reports of her performance. And like the Plaintiff

in *Harris*, Plaintiff's strongest evidence comes from a single coworker whose "general attestations

don't create a genuine dispute about whether the documented, specific instances [of poor

performance by Plaintiff]—which the coworker doesn't deny—actually occurred." *Id.* at 1306 n.6.

Essentially, Plaintiff offers only "mere conclusions and unsupported factual allegations." *Ellis v.

England*, 432 F.3d 1321, 1327 (11th Cir. 2005). This is insufficient for a factfinder to conclude

that "the desire to retaliate was the but-for cause of the challenged employment action." *University

of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). As such, Plaintiff has failed to create a

genuine dispute about whether Defendant's stated reasons for her discipline and termination were

pretextual.[18]

As a final matter, as with other claims, retaliation claims that fail under the *McDonnell

Douglas* standard can survive under the convincing mosaic approach. *Lockheed-Martin Corp.*, 644

F.3d at 1328. But "a plaintiff's failure to prove a *prima facie* case under *McDonnell Douglas* 'often

also reflects a failure of the overall evidence.'" *Copeland*, 97 F.4th at 782 n.8 (quoting *Tynes v.

Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944–45 (11th Cir. 2023)). And that is precisely the case here.

"At the end of the day, a retaliation plaintiff's 'mosaic' of evidence must still be enough to allow

a reasonable jury to infer but-for causation." *Yelling*, 82 F.4th at 1342 (citation omitted). Plaintiff's

evidence is simply not convincing—particularly on the point of showing discriminatory intent—

insofar as it is (i) overwhelmingly devoid of racial animus from any company leadership and (ii)

---

[18] The Court pauses for a moment to note the close temporal proximity between Plaintiff's HR complaints and her termination. While close temporal proximity can go a long way towards establishing a causal connection, *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798–99 (11th Cir. 2000), "an intervening act of misconduct" can "diminish[] any inference of causation." *Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011) (citation omitted). And that is what Plaintiff's analysis misses. Her reports occurred at the same time as her continued poor performance. Indeed, most of her reports occurred during February and March of 2024, ECF No. [35] at 16, but in February, March, and April of 2024, Plaintiff missed the *majority* of her performance targets. ECF No. [29-3] at 32, 41.

rife with unrebutted examples of actual poor performance by Plaintiff. Thus, Plaintiff's retaliation claims must also be dismissed.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment, **ECF No. [30]**, is **GRANTED**.

2. Summary Judgment is granted in favor of Defendant and against Plaintiff as to **COUNTS I, II, III, VII, VIII, and IX**.

3. The Clerk of Court shall **CLOSE** this case.

4. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on **March 25, 2026**.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record